The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Please be seated. All right, we're prepared to hear argument in our first case. Coleman v. Whitney. Ms. Patozak. Good morning, Your Honor. May it please the Court, my name is Paula Patozak. I represent Trinette Coleman in this appeal from the lower court's decision to dismiss. You're welcome, but are not required to take your mask off. Oh, actually, thank you for reminding me. To reverse the lower court's ruling, which granted summary judgment to the United States Army on the issues of disparate treatment, racial discrimination, gender discrimination, essentially, and hostile work environment. We ask this because there are material issues of fact in essentially three crucial areas. One is job performance, two is the issue of comparators, and the third one is the actual discriminatory treatment that Ms. Coleman experienced throughout her tenure at the Korean facility, the Korean military facility. As to job performance, the lower court essentially made a finding of fact, which was not within the judge's province to do in summary judgment. And the error is this, the Army admitted that there was failure to train on Gibbous, which is evidently a very complicated computer system, that Ms. Coleman was absolutely, it was absolutely necessary for Ms. Coleman to have in her performance. They acknowledged in answers to interrogatories that they failed to train, and they also, I'm sorry, Ms. Hornsby, who was head of HR for the Army, admitted and acknowledged in two places, her deposition and in emails, to Ms. Coleman's second line supervisor, that the Army HR had essentially failed Ms. Coleman in how they trained her on the GFEBS system, which she could not use at all until August of 2012. She entered into service in February. So essentially for six months of her eight months evaluation period, she had no access to the system or very limited access. That is essentially- She had her experience to do other functions of her job, such as DTS, which is the tracking service for budgetary travel and things like that within the Army. She had that experience from her previous position. She had, as within any new job for any new employee, questions about certain functions as to how this particular office did the work, but she did have those capabilities. She was hired because of those capabilities. And in fact, during her panel interviews, it was represented to her that she did not need to know the GFEBS system and that she would learn it on the job. She took her online training system, the online training courses, she completed them in May. The Army then added additional requirements, two or three of which had to be in person. I'm sorry. You said earlier you blamed the Army, you said from February to August, but then you just said she didn't complete her training until, or at least the first part of her training until May. So isn't she then responsible for having not completed the training? There were 20 courses that she had to take, Your Honor, over a period of time. There was no time limitation on her. No, no. I'm not blaming her for taking a long time. Maybe, but the point is, the Army is not responding. The Army says, you must do this. If I hand you a piece of paper and say, you must fill out this piece of paper before you do X, and you take six months to fill out the paper, that may be perfectly fine. I didn't put a time limit on it when I gave it to you, but you can't do X until you fill out a piece of paper. She was not given, Ms. Coleman was not given any time frame within which to complete. Totally fair, but I hand you the piece of paper and I say, you cannot go to such and such a place until you fill out this piece of paper. I didn't say, and you must fill out the piece of paper before a certain date, but you can't go until you fill the paper. In the hypothetical I'm giving you, the delay in you going to this place or doing X is you not filling out the piece of paper. But she did the courses as soon as she was able to do the courses. There was no time limit on them. That's the question. The question that we're challenging or having trouble with is whether her abilities allowed her to do the job. I think that was Judge Thacker's question. Yes, she might've done it as quick as she can. But the question is whether that ability, if it took her that long to do it, maybe that's really not the Army's fault for not giving her access, but her inability to comprehend and manage the job. I think I misunderstood the question. The question is essentially whether or not she had, for want of a better way to characterize it, intellectual ability to study and learn the GFEBS system. And to that, the answer is yes, because she successfully completed the courses as they sort of rolled off the online training. Totally fair. But if my daughter completes algebra, but it takes her four years to do the one-year class, we might think that she's not a math whiz, right? No offense to your daughter, but yes. But that is not the situation and there's no factual support for that. I know, but we began with the idea that you said, oh, the Army, the Army didn't give her access. It was the Army's fault from February to August. They wouldn't give her access. But then you turn right around and say, but she couldn't complete the required precursors until sometime in May. And that wasn't even all of the precursors, right? Well, it wasn't all the precursors because the Army then added additional precursors. That might've been important because it took her like four times as long to finish, right? The additional courses were part of the, for want of a better word, standard of training for Army employees to be able to function within GFEBS. In addition, there is nothing in the record that intimates at all that she was incapable of learning the material. It was that she did what she was asked to do, did it from what you can divine from the and was, had additional courses added. Counsel, excuse me. What does all this have to do with race? I mean, there are situations where people experience disappointments in the job and they don't get promoted as quickly as they wanted, or they didn't get this, or they didn't get that. But the explanation for disappointment is not always racial. And I don't understand, you have a disagreement with the Army over access and over the quality of performance, but what does it have to do with race? It has to do with race, Your Honor, Judge Wilkinson, because the into which she started in February of 2012 had a serious problem with racial animus. At the point in time she started, her hiring supervisor was accused of being a racist and being anti-Korean. And there was a vitriolic complaint lodged against him. She's not Korean, right? No, but Mr. Bridges, the gentleman against whom the complaint was lodged, is African-American Black. He hired her. There was a second anonymous complaint submitted to the Army system, which directly implicated Ms. Coleman, called her incapable, called her, stated that she was hired only because she was Black, that Mr. Bridges hired only Blacks. And I believe it was also in that anonymous complaint where it was, well, it was pretty much stated that he hired her because she was a Black female, the underlying intimation being that there was an illicit relationship of Army has cited the fact that reports were handed in late and that there were all sorts of, they were riddled through with errors that required a more intensive editing. And she eventually got the training she wanted. She got the promotion she wanted. But what showing is there that these deficiencies that were noted in her performance, how is that protectual? And in any way, it didn't, it seemed to me that they had a pretty good basis for finding that the performance was subpar and that's their view. They seem to act on it. But how is that pretext for racial discrimination? It is protectual, Your Honor, because, well, two things. Number one, Ms. Cha, who was tasked to train her both in GFEBS and in just regular office procedures, made it very clear early on that she didn't like Ms., and not that she didn't like Ms. Coleman, but she resented Ms. Coleman. She told her superiors, as well as Ms. Coleman, that Ms. Coleman got the job only because she was Black and Mr. Bridges hired Blacks. That's sort of one. Two, Ms. Cha repeatedly made racial comments to Ms. Coleman about her accent and how she had a funny accent and she couldn't understand her. How are Ms. Cha's comments and actions and statements imputable to Ms. Coleman's employer? The Army. Ms. Cha advised Mr. Skillen at a minimum, and there are emails and depositions testimony to this effect, that Ms. Cha was hired only because she was Black, that she hated Koreans, that- But how does her advising Mr. Skillen make what she did imputable to the Army? Well, Mr. Skillen is the supervisor. He knew about the racial- Who's Ms. Hornsby? Is she above Mr. Skillen? Not in a direct organizational sense, but she is head of HR and work. She's head of HR. Did Ms. Hornsby agree with Mr. Skillen and Mr. Dickman that Ms. Coleman's performance was not where it needed to be and she was struggling? Ms. Hornsby testified, and there's also an email to this effect, that the Army failed Ms. Coleman in training her- My question is, didn't she say, didn't Ms. Hornsby say, I agree with you completely, that at her level she should know the basics of budgeting and that her performance was not where it needed to be? That's in an August 17, 2012 email at JA 638. Ms. Hornsby said that, correct? Yes. All right. And is Ms. Hornsby Black? Yes. I believe so. I am actually not. I think it's in the record. I don't think I did focus on that, but I believe that she is, yes. Okay. So going back to Judge Wilkinson's question, how is the delay in her promotion based on race when it's not, I don't see how it's imputable to the employer and one of the supervisors who, the head of HR, also found that her performance was not where it needed to be. Now they did give her training and her but how is this all based on race? The way in which she was not trained, if you will, within her office. Can you please speak up? I'm having difficulty hearing you and I want to make sure that I do. I'm sorry, Your Honor. The way in which she was trained or not trained, the atmosphere in the way. Ms. Cha would not answer her questions. There were issues. Was Ms. Cha her supervisor? She was. Or her coworker? She was a coworker instructed by the supervisors, Mr. Skillen and Mr. Dickman, well, Mr. Bridges, Mr. Dickman later on, to teach Ms. Coleman office procedures and to help her get to know GFEBS. They were coworkers in the sense that were both GS-11s. But it's imputable to the Army, the supervisors, because the supervisors knew this was going on and did nothing about it. Ms. Hornsby is not a supervisor in the sense of a rating supervisor or giving Ms. Coleman reviews. Mr. Dickman and Mr. Skillen did not understand or budgeting or how to and had never supervised budget analysts. And they were inquiring to Ms. Hornsby for advice as to how to handle this. She was. All right. Thank you. Thank you, counsel. And you've got some time for rebuttal. And we will hear from you at that point. Okay. Thank you, Your Honor. Ms. Marquardt, we'd be pleased to hear your side of it. Thank you, Your Honor. May it please the court, Sarah Marquardt on behalf of the Secretary of the U.S. Department of Army. Your Honors, this entire lawsuit boils down to Ms. Coleman's year, provided she performed satisfactorily during her first year at the GS-11 level. There was no automatic promotion. Ms. Coleman sets forth an unsubstantiated narrative that the workplace was marred with hatred towards her. This is not grounded in fact. Wait a minute. I mean, Ms. Cha did make a number of discriminatory and derogatory statements about Ms. Coleman, didn't she? Ms. Cha and Ms. Coleman certainly had a disharmonious relationship, Your Honor. I will certainly agree with that. And Ms. Cha did make statements to Ms. Coleman that were rude and insulting, quite frankly. But how that is imputable to her employer is an entirely separate matter. Right. I was just remarking on your statement that the allegations of discriminatory animus within the office place are not based in fact. And that was what you were trying to say with regard to the promotion, right? Exactly, Your Honor. None of this happened. Certainly. I will not dispute that there were some racial overtones within the workplace, certainly. However, how that is imputable to her employers is an entirely separate issue and why we are here today. For employers, there's no genuine dispute of fact that her employers, Mr. Skillen, Mr. Dickman, Ms. Hornsby, Ms. Panther, harbored any discriminatory animus towards her. And as required at the summary judgment level, the district court construed the facts of the record as opposed to Ms. Coleman's speculations that her supervisors embraced these statements by Ms. Cha, her colleague, not a supervisor. And the district court construed these facts in the light most favorable to Ms. Coleman and correctly found that there is no dispute of facts. And Ms. Coleman has offered no persuasive grounds for the reversal of that sound decision. The record is quite clear, Your Honors, that as a GS employee, Ms. Coleman was hired with the presumption that she had the very quickly that she did not have those skills. The record reveals that Ms. Coleman herself testified that she was constantly criticized by her supervisors for reasons- Why did it take so long to provide her with the training she needed and to give her access to the system that she needed? Your Honor, it did not take as long as Ms. Coleman would like this court to suggest. How long did it take? There was a mere four-week delay after she completed the required courses. So, Ms. Coleman's suggestion- So, a month after she, it took a month after she completed the required courses for her to gain access to the information she needed on the computer to do her job? No, Your Honor, that is not correct. I am referring specifically to the GFEB system, which is the Army's budgeting system.  It was, access to the GFEB system was certainly a portion of her job, Your Honor, but it was not the end all, be all. And this is quite apparent on Joint Appendix 132 to 138. And this sets forth all of Ms. Coleman's job duties. Some of those job duties had to do with GFEBs, but certainly not all. And Ms. Coleman testified- So, in that month delay between her finishing the training and the Army giving her access to GFEBs, she didn't have any work that would have required her to be on GFEBs? Your Honor, I'm not sure if I can unequivocally say that there was no work that might have needed GFEBs access, but certainly she was a very busy employee with a host of other job duties. And what's important here, Your Honor, is that- I'm sorry, what were the days that she mentioned a minute ago, 132? 132 to 138, Ms. Coleman testifies with regard to her other job duties. For example, providing advice and assistance in the development of budget requests, planning and estimating funding needs for civilian pay entitlements, benefits, travels, and contracts, managing the overall system for the defense travel system, review and adjusting regional tables of distribution- Anyway, going back to my question before, I think it was, why did it take a month for the Army to give her access to the GFEBs system? And Your Honor, there were some security concerns. There's mention of this on JA 189 to 190. There were computer permissions that Ms. Coleman had to and if Your Honors will recall, this is an unusual employment environment and that Ms. Coleman was situated in Korea and is dealing with security issues across the entire world in Aberdeen, Maryland. So, certainly there was a delay, but how that- Can you point me to where in the record we can best understand the source of that delay? So, in other words, you might imagine that delay coming from the United States, this side of the pond, if you would. And you might imagine it coming from the Korean side of the pond, not to overgeneralize too grossly. Is there anywhere in the record we could look to see for that four weeks? Is it responsible in the United States? Is it responsible there? And the reason I ask is, obviously, if it's in Maryland, it strikes me as less likely to be certainly. Your Honor, JA 189 to 190 references the security issues that were at play in accessing the system. To answer Your Honor's direct question, I don't believe that the record explicitly says whether those computer permissions and the security issues were housed in Korea or in Aberdeen, Maryland, but I feel comfortable representing to the courts that because the HR system- It's not in the record. That doesn't help me. Right. You're representing- No, no, it's fine. It's not a knock on you. And I guess, let me ask it slightly differently. Is there any indication that Ms. Cha was responsible for computer access or security issues within the organization? No indication of that in the record at all, Your Honor. The record does not support that. When I was reading the record as a whole, it seemed to me that there were a great range or a significant range of deficiencies in her job performance and that those deficiencies were that the reports were simply riddled with errors and that they were late and that that had led to the delay. And I didn't understand that many of those- I didn't see where many of those deficiencies which were independent of the GFEBs were in dispute. Am I correct in that? You're absolutely correct in that, Your Honor. And I'm happy to point the court to some examples that Your Honor references with regard to those issues that, quite frankly, Ms. Cha- Excuse me, Ms. Coleman lacked the basic budgetary understandings that the job required. Her work on the PBAC forms was incorrect. Joint Appendix 203, 206 to 207, and 210. She was not grasping the complexities of budget work that a GS-11 employee should have, 374. She required reminders regarding basic budgeting principles, such as the differences between reimbursable and direct funded employees, JA-336. Monthly reports had to be reworked because of this mistake. Mr. Dickman had issues with Ms. Coleman's basic understanding of the JA-1137. She didn't grasp the complexities of her position, JA-1042. Not only did she lack the basic budgeting principles, as Your Honor notes, that are separate and apart from any access to GFEBs. Her work was untimely. So, not only was it flawed, it was untimely as well. Your Honors can find references to this at Joint Appendix 742, 1042 through 44, where Mr. Skillen and Mr. Dickman testified that Ms. Coleman frequently missed deadlines for submissions to reports to headquarters, and that because of her untimely work, because of this deficient work that had nothing at all to do with access to GFEBs, they required her to submit reports in advance of headquarters deadlines or to give them updates to ensure that she remained on schedule. So, Ms. Coleman blaming her access to GFEBs does not represent the entire picture. And what the factual record shows, Your Honors, is that she exhibited performance deficiencies from the start. She had to complete courses for GFEBs access. She took some time, as Judge Richardson noted, in completing that access, and then ultimately got access to the system. If Your Honors may, I'd like to turn briefly to Ms. Coleman's argument that similarly situated employees outside of her protected class were treated differently. The district court soundly determined that Ms. Coleman has not shown that similarly situated employees outside her protected class were treated differently with respect to the adverse employment action that she alleges. And I want to circle back and harp on the fact that the only adverse employment action at issue here is a four-month delay in promotion. The agency didn't terminate her. The agency didn't let her out to continue with these performance deficiencies. What the record shows is that Mr. Skillen, upon giving her the fair or needs improvement performance rating, counseled her for over an hour on her performance and how to improve her performance. And also worth noting is the fact that the agency sent her on an overseas trip to Aberdeen, Maryland. This is the first time ever the agency has engaged in this type of expense for an employee to observe in-person training. As Your Honors can imagine, this is not an inexpensive trip. It was a $5,000 cost to the agency to send Ms. Coleman. And they did this. It did this because it was trying to better her performance. It was trying to help her. And she did improve. She did turn around and show improvements. And when she showed improvements- what I'll call the promotion, or was it before? I'm just trying to understand where in the timeline we think- Certainly, Your Honor. She was on the job for several months. Ms. Hortonsby recommended that she travel to the headquarters in June. I believe that the training was in the fall. And then her appraisal was for the February 13th through the October 31st rating. Around the same time, we don't know, at least as you're looking at it, we don't know if it happened before. She was recommended well before in June. But whether she went before or after she got the unsatisfactory rating, we don't know. It was certainly after she received that in-person training and counsel during her review that her performance began to turn around. And that was in the fall, late fall of that time period. Did you finish everything you wanted to say about the similarity situated issue? No, Your Honor. If I may, I'd like to circle back to that. The comparator that Ms. Coleman points to, Ms. Chaw, first of all, with regard to gender, it's inherently fatal to her gender discrimination claim because Ms. Chaw is also a female and not outside Ms. Coleman's protected class. Turning to the race and color allegations, Ms. Chaw, the district court soundly determined that Ms. Chaw is an insufficient comparator. There are distinct differences between their job duties, the GS classifications, and their employment history. Let's turn to job title. They had different job title, management analyst versus budget analyst. They had different job duties. JA-200, JA-876 highlights some of these differences. And perhaps most significantly, Your Honors, Ms. Chaw's job was not a developmental position like Ms. Coleman. So she did not have the opportunity to automatically advance to a GS-12 assuming she had good performance. Ms. Chaw was a strict GS-11 employee and simply did not have the same opportunities. She was never given a position, an advancement to a permanent promotion to GS-12. I'm sorry, the GS scale remains a black box to me. But here, Ms. Coleman started at 11 and what she was trying to get and what ultimately got four months late was a promotion to GS-12. That's exactly correct, Your Honor. And Ms. Chaw, what you're saying is Ms. Chaw was an 11 and was never considered for a 12. That's correct, Your Honor. So to use her as a comparator for a delay and getting to a 12 doesn't get you very... That's correct. She was maxed out at GS-11. Which is why Ms. Chaw had applied for Ms. Coleman's job because she wanted the ability to... She wanted the ability to advance. And I think that that point highlights a lot of the disharmonious relationship at play here in this case. Ms. Chaw wanted that job. She trained herself using binders and job aids. And when Ms. Coleman came on board to a job that she wanted, she expected her colleague to be able to get up to speed. And she was not able to get up to speed. And for all the reasons that I highlighted previously, access to GFIBs is inconsequential to that. She had a host of other job duties. And she did not demonstrate the basic budgetary principles that were required. Ms. Chaw also touched... Is there anything further? I'm sorry, Your Honor. Do you have anything further? Your Honor, the one issue that I have not touched on, if I may, is the hostile work not shown. And the district court appropriately determined that there was no conduct that occurred because of her race, color, or gender, nor was it sufficiently severe or pervasive to create an objectively hostile, abusive work environment. As Your Honors know, the sufficiently severe or pervasive standard is a very high standard. Rude treatment by a co-worker will never meet that standard. The only conduct that Ms. Coleman spoke to with regard to her supervisors was that Mr. Skillen constantly criticized her work. He told her, I would never hire you. You don't know what you're doing. That's rude. It's not something that an employee wants to hear. It's certainly not sufficiently severe or pervasive. And for all the reasons that I've mentioned, Mr. Skillen was arguably frustrated with Ms. Coleman's performance. She didn't know how to do the basic principles of her job. So he was arguably in his right to express some frustrations over her inability to carry out the rudimentary principles. With regard to any claims of Ms. Chaw, Ms. Coleman also has the burden of showing that that is imputable to her employer. Harassment by a co-worker resulting in a hostile work environment can be imputable to an employer, but only if the employer- Can you talk for just a second about, I mean, the one part of this that, just the district court's analysis that I was curious about, you know, is Chaw's alleged statement to Coleman that she was hired only because she was Black. And there's also sort of some record about Mr. Bridgers and him being disciplined in the manner of his hiring or treating of employees. Can you talk about those? Is there anything that I need to know about Mr. Bridgers to evaluate Ms. Chaw's statement? There's nothing that you need to know, Your Honor. There's a big background with Mr. Bridges in that he was investigated for being disrespectful to Korean nationals. He took around Korean employees to do his dry cleaning and to translate and do all these improper things. So he was investigated for some inappropriate activities within the workplace, which eventually resulted in his leaving the workplace. That is a complete side issue. Ms. Coleman is wrong to try to import the claims of bias against Bridges and bootstrap them to her claims. I guess I was thinking about it a little bit differently, right? If Mr. Bridges was found to be discriminatory to Koreans, and if you take that to the extreme, then the statement that she was hired because she was Black, or at least because she was non-Korean, might well have been true. We're trying to figure out whether that matters. It does not matter, Your Honor, respectfully, because we're looking here at what her supervisors on the ground, i.e., Mr. Skillen and Mr. Dickman, observed regarding her performance. It's not about hiring. Exactly. It's inconsequential. With that, I see my time is up. Thank you very much. All right. Thank you very much. Ms. Potosak, you've reserved some time for rebuttal. We'll be pleased to hear from you in rebuttal. As to the comparator decision by the lower court, the issue of whether or not a comparator is appropriate is a question for the jury, and it's not one that the lower court should have made. That's number one. Number two— Do you think that's true with respect to her gender, that you've got to submit to the jury whether Ms. Cha—I shouldn't say Ms. Cha—the person identified as Cha is a woman? Ms. Cha is a woman. And the gender issue is not—we are not advancing a straight gender discrimination. It is just a— Okay. What about the fact that Ms. Cha was a GS-11 and not eligible for promotion to a GS-12? I think in this case, Your Honor, it is not determinative and is not quite— But does it need to be submitted to a jury is what I'm asking. You said all of this needs to go to a jury, whether she's a proper comparator. And so I was asking about some of the comparisons. I think that to the extent that it is a question of fact as to whether or not the comparator to be similarly situated had to be—both had to be a GS-11— But if you agree she's an 11, Ms. Cha was an 11, not eligible for the automatic promotion that your client wanted. Correct. But I don't think that's determinative. It is certainly an issue of fact as to whether or not it is determinative to be sent to the jury. But there are so many other similarities between what Cha and Coleman did, virtually identical, that the fact that Cha could not get it was not a GS-11 slash 12, which is automatic promotion. It's something to consider, but it's not the most determinative item in the panoply of facts that show how Cha and Coleman were comparators. They essentially did the same job. Coleman— And neither of them got a promotion to a 12 at the end of one year. Ms. Cha got a promotion to a 12 at some point in time. After your client. I'm not sure about that. Ms. Coleman's promotion was effective May 31, 2013, and Ms. Cha got it before that. Ms. Cha got it at some point prior to May of 2013. And so, the issue of comparators for the GS-12 issue is just one of many factors, and they don't have to be exact. Ms. Cha actually got GFEBS training. She went to Korea in the year prior when GFEBS was installed by the U.S. Army. So, Ms. Cha got all of the training, if not more, than Ms. Coleman received. She got in-person training while she was in Korea, and then Ms. Cha went with various other persons from the headquarters in Seoul to Aberdeen to be trained on GFEBS, and that occurred prior to Ms. Coleman's hiring because the GFEBS system was installed in essentially the end of 2012. So, Ms. Cha had tremendously more training and experience in doing the budget than Ms. Coleman had, and Ms. Cha, quite frankly, did the GFEBS budget tasks for a period of time when Ms. Coleman was not there. She knew the system very well, and that's why she was instructed to train her. The fact that she wanted the job and went to Mr. Skillin and said that the only reason this woman was hired is because she is Black colored the entire rest of their relationship, and it's clearly a huge fact in the statement that Ms. Coleman received in the office. Mr. Skillin. Don't you agree that after Ms. Coleman received the fair evaluation or that she was not performing as she should, that she was counseled, they worked with her, they gave her training to get her to where she needed to be to get the promotion that she wanted, and she ultimately did get the promotion? So, there's no question that that happened, but it happened late, and it happened with a panoply of facts of racial discrimination, and quite frankly, racial... What you mean the four-month delay when you say it happened late? The four-month delay in the promotion is because of the way Ms. Coleman was treated and not trained properly from February until... Treated by Ms. Cha. And Mr. Skillin as well. I mean, Mr. Skillin knew that there was a racial issue between Coleman and Cha. He did nothing about it. He shrugged it off. The notion that an employee tells a supervisor that the only reason she was trained is because she is Black and then just says she's venting, I think is indicative of the atmosphere in which Ms. Coleman was forced to work. All right. Thank you very much. We appreciate it. We'll now move directly into our next case.
judges: J. Harvie Wilkinson III, Stephanie D. Thacker, Julius N. Richardson